Our first case for argument today is 21-2041, Valencell v. Fitbit. Is it Mr. Pagan? Am I saying it right? Pagan. Pagan. Okay. Please proceed. Thank you. Good morning, Your Honors. May it please the Court, my name is William Pagan. I'm here representing Appellant Valencell. This appeal is taken for a final decision by the CTAB, finding that claims 30 through 5 of Valencell's patent were obvious in view of the disclosure in CRAW patent. The decision of the PTAB should be reversed for lacking substantial evidence. Substantial evidence means such relevance as a reasonable mind might accept. And it's adequate to support a conclusion. There are a couple of things I'd like the Court to agree with me on in finding that the Board's decision was unreasonable. The first thing is that the design intent and purpose of CRAW, what is that solution intended for? And it's fairly clear at paragraph 46, which can be found at appendix 473, that CRAW is intended to enable devices to communicate with applications regardless of application specifics. It is explicit on that point. So... You're talking about Laue, the primary reference, right? Or are you talking about CRAW? CRAW. Okay. And it's your view that it's not an application-specific interface because it can operate with multiple applications? Oh, not simply that, because it can operate with several applications, because CRAW specifically states that it operates regardless of application specifics. That's a quote directly from paragraph 46. And in fact, CRAW states that its invention provides for information plug-and-play regardless of the source and notably, quote, may reduce or eliminate the cost burden of manufacturers and traditional standards-based approaches by providing a platform that is independent of specific application needs. It's not reasonable for the Board to say there is a solution that is independent of application-specific needs, and yet somehow enables an application-specific interface. But it's tailored to specific applications, right? An application-specific interface is an interface that has... No, the prior art is... CRAW, whatever the name of it is, is tailored while it can apply across the Board. It's tailored to specific situations, right? No, the CRAW solution, the way that it works is it's an intermediate... it's a middleman, essentially. It's a framework that sits in between the devices and the applications. And what it lets the devices do is essentially just output however it likes, provided that it also supplies a data dictionary. And the data dictionary can be thought of as like a decoder ring for the output that devices produce. And if an application wants to make sense of the data that a device is producing, it can pick up the dictionary and look up anything that it finds in the output and say, oh, okay, I can interpret that now. Does your patent specification anywhere emphasize the application-specific nature of your interface? Because if I look at, for example, column 26, lines 15 through 21, it suggests to me that even your application-specific interface may work with multiple applications. I would respectfully disagree with that point. Do you want to look at that section and tell me why I'm reading that incorrectly? You're referring to... It's lines 15 through 21. It says the application-specific interface API can utilize the data as required for a particular application. And then it says the applications may use this data. There's a plural there. I would submit that that entire section is intended to enable a higher-level application that is looking at overall patient health. And so there is a interface that allows for the extraction of the data. But then once that data has been extracted, other applications could potentially make use of that information. How is that different than CRAW? Well, CRAW teaches that you have multiple applications that are making use of the same interface. So that interface is generic across multiple applications. The application-specific interface cited in 3 only exists in one place, specific to a particular application. So in other words, if you look at, let's say, for example, in CRAW, the figure 1C at appendix 428, you'll note that all of those applications that are depicted there are plugging into the framework in a common way. There's nothing special about any particular interface there. No application is serving as a bridge for any other. Does your specification talk about the importance of this aspect of the claim? Not directly. Your specification doesn't say why this is important or anything? It's a bit implied from the technical context of the time. You know, miniaturization of healthcare devices down into the wearable scale where, you know, you've got a sort of a tightly coupled environment. You can think of it as sort of the earbud model that you have now, right? Your earbuds are only supposed to talk to your cell phone. They're not really built or designed to talk to, to be broadcasting to everyone at the same time, right? It doesn't have a wide audience. I'm just trying to understand why an application-specific interface, the way you're understanding it, is advantageous over an application-specific interface that might be able to be individually really configured to operate with different applications. I would say the details of that are not provided in the specification, but, I mean, I would analogize it to other scenarios where if you're communicating healthcare data, you probably don't want to be broadcasting that out from your earbuds to a wide variety of applications or a wide variety of devices. This is sensitive data. But, again, this is not, this is not, the details of that are not provided. So, your view is something like the application interface is detecting the blood pressure should be kept separate from the application interface that's detecting motion or something? Precisely. Right, the spec doesn't actually say that. Right. Okay. Thank you, yes. All right. I think it's important to note also that simply by enabling applications broadly, it doesn't come along for the ride that in particular application-specific interfaces are also enabled. Right. I think the best way to illustrate that is maybe by analogy. I mean, sort of stepping back from the technology a little bit and just sort of understanding. Let's say, for example, a professor is giving a lecture to a group of students. And there happens to be one student in that group that's deaf. Giving a lecture that caters to the needs of everyone in the audience and, you know, doesn't allow for that deaf student necessarily to be able to interface and make usable the information that's being provided. The information that is being verbalized, right? If that deaf student can only communicate as a specific way in which they are required to communicate. But doesn't Kroll talk about how each of its application interface could be modified to provide the different parameters as required by the application that it's feeding the information to? I'm sorry, I'm not understanding your question. Well, I guess I'm struggling with your hypothetical because Kroll teaches that its application interface can be modified to provide the information required by the other application that's going to then process it. Ah, no, I would disagree with that, respectfully, Your Honor. I believe, would submit that Kroll teaches... Do you think the board found what I just said? The board found that it does teach that, right? I think that the board found that it didn't have to find catering to the specifics of an application based on the guidance given by this court previously. But what about page K24? It says, thus Kroll makes clear that data dictionary interfaces are tailored to be specific to the device or device and the measured data. Therefore, to understand Kroll's interfaces, the teacher suggests application-specific interfaces. Right, so catered and tailored to the device is not a finding that the interface is tailored to any particular application. They go on to say... It has to do with the recipient and not the... the sender and not the receiver. Well, it says they go on to say because they act on the received information in a way that, quote, depends on the goal of the application. Well, the application can pick up the standard and the information provided by the devices and... The problem is the portion that Judge Dyke just read you and that I followed up with, I don't see how that's not substantial evidence to the board's decision. I understand you'd like us to interpret it or read it differently, but we don't read it to no vote. We have to look at it and say, you know, is there substantial evidence to this finding by the board about what this reference discloses? I would submit that the portion that you're citing to has to be read in context with paragraph 46 that says that the platform is independent of application specifics. Yeah, but that's very inferential. You want us to incorporate in paragraph 46 in a way that results in that language that Judge Dyke read, which clearly supports... in a vacuum, that clearly supports the board's fact-finding, and you want us to read paragraph 46 as inferentially having changed what that language means, and I don't see under a substantial evidence standard how we can do that. I would agree with you that in a vacuum that would be true, but the board is required to consider the totality of the teachings of that reference. It's not... Why do you think they didn't do so? Because I don't think a reasonable mind would read that the platform is independent from application specifics and then find otherwise. Do you want to save the rest of your time for rebuttal, or... Yes, ma'am. Thank you, Your Honor. Mr. Keller, please proceed. May it please the Court, good morning, Your Honors. Bail and Sell has never disputed before this Court that the board was right in its first final written decision that the combined prior art here teaches the method of outputting data, a data string, from a device that has two sensors in it. That's Claim 1. We're here about Claim 3. Claim 3 adds a simple functional requirement that the data is parsed out such that an application-specific interface can use it for an application. No one is disputing that there might be a difference between an application-specific interface and an application-programming interface, but the problem is that this Court correctly foreshadowed in its earlier decision that that doesn't actually make a difference here because the function of the claimed application-specific interface is performed by the prior art. And that's precisely what CRAW teaches, and there's substantial evidence supporting the board's finding for that effect. Bail and Sell wants to make the dispute about whether CRAW does more than an application-specific interface, whether it enables multiple different interfaces to use the data. That doesn't matter. And the problem with counsel's hypothetical illustrates the point. If there are students in a classroom with different needs and the professor is able to convey information so that each individual one of those students can pick up the data being transmitted, then that professor is directing data to specific students even though she's also directing data to the entire class. Now, even if there were a doubt about that reading of CRAW, CRAW supports the board's finding because it demonstrates that the information is directed to a specific application, and the board cites CRAW at paragraph 208 and CRAW's figure 9A. 9A, of course, is the display in CRAW that shows the blood pressure. That's the application output. It's a specific figure. It's from a specific application. So even if one wants to quibble with the fact that directing data to multiple applications is somehow not also directing data to a single application, CRAW teaches that the data is directed in its embodiment to a particular application. As for claims 4 and 5, counsel did not address those claims this morning. So unless the court has further questions, I'll yield the remainder of my time. Thank you, Mr. Kelly. Thank you, Your Honor. Thank you, Your Honors. I will just take a slight issue with Apelli's characterization here. There are more actors in claim 3 than are being discussed by Apelli. The claim says that the data is output so that an application-specific interface can use it for an application. There's a difference between the application, the application-specific interface, and the device. The issue is not whether or not these applications can ultimately get the data. The question is the manner in which that data reaches the application.  that must be enabled to utilize the data. The fact that the data ultimately gets there by some other means, by some generic means, is not what claim 3 recites. And that is the portion that the Board has skipped. With respect to waiver, I would simply submit that Appellant is putting its finger on where the Board has missed, has not provided substantial evidence, and the burden was always on Petitioner to demonstrate that and prove its case with respect to the obviousness of claims 4 and 5, and request that this Court review whether or not the Board met its burden to provide information, provide sufficient findings with respect to obviousness in that regard. Thank you.